H. T. GARNETT, Admr., &c., et al., *v.* LEVI COWLES and WIFE.

1. WILLS: EMANCIPATION: ACT OF 1842 ON THIS SUBJECT CONSTRUED.—By the 11th section of the Act of 1842, Hutch. Dig. p. 539, a bequest of slaves for the purpose of emancipation, either here or elsewhere, is void, whenever such purpose is shown, either on the face of the will or by extrinsic evidence, to have existed on the part of the testator, even though not participated in by the legatee.

2. SAME: SAME: RESIDUARY LEGATEE TAKES IN PREFERENCE TO HEIR.— The rule announced in *Manning* v. *Read,* 30 Miss. R. 308, and afterward confirmed in *Lusk* v. *Lervis,* 32 id. 297, and in *Lusk* v. *Lervis,* 35 id. 401, to wit, that the following clause of the 11th section of the Act of 1842, "but the same" (slaves bequeathed for the purpose of emancipation) "shall descend to and be distributed amongst the heirs at law of the testator, or be otherwise disposed of according to law, in the same manner as if such testator had died intestate," applies to wills made after its passage, is recognized and adhered to. But, nevertheless, where the primary intent of the testator is, that his slaves shall be emancipated, he may make a secondary alternative disposition of them; and such slaves will, therefore, go to the residuary legatee in preference to the heir.

3. HIGH COURT: HOW OPINION CONSTRUED.—The language used in delivering the opinion of this court must be construed with reference to the facts then before the court.

APPEAL from the Court of Probates of Yalobusha county. Hon. G. Q. Martin, judge.

Garnett, Admr., et al., *v.* Cowles and Wife.

The petition in this case does not appear in the record; but it appears from other parts of the record, and the argument of counsel, that it was filed by Mrs. Cowles, the heir of Samuel Hurd, deceased, for the purpose of procuring distribution to be made to her of all the slaves of said Hurd, upon these premises: 1. That the said testator had bequeathed them to the American Colonization Society for the purpose of emancipation; and, 2. That the fourth clause of the codicil by which Waul was made residuary legatee was executed in secret trust that Waul would co-operate with the American Colonization Society in the illegal purpose to emancipate; and, 3. That by the Act of 1842 the slaves which had been bequeathed for the purpose of emancipation would go, at all events, to the heir instead of the residuary legatee.

The following letter was filed with the petition as an exhibit, and it was charged that it was written by Hurd on the day of its date to R. S. Finley, one of the trustees named in the will, and by Finley published in the *Liberia Advocate:*

MISSISSIPPI, *April* 28, 1846.

DEAR BROTHER:—I received the third number of your colonization paper. I enclose $1.00 for two copies of the first volume to my address. My health is bad and I must be brief.

I wish my slaves (forty or fifty in number) to be sent to Africa in a few years. Now they are working to pay a debt, while I trust I am preparing them for liberty. By the law of Mississippi no slaves can be emancipated by will under any circumstances. This I presume is not generally known among the people, but ought to be widely published. In my will I direct my executor to sell all my slaves, as well as other property, and to pay the proceeds to the trustees of the American Colonization Society. I wish the trustees to be purchasers of all that are suitable to go to Liberia, and the money arising from the remainder and other property to go to their benefit. In case of my death I commend this matter to your care and wisdom. You can procure a copy of the will and learn the condition of the estate, *and in connexion with the other trustees and the executor* do what seems best. My wife willed hers to Liberia when she

died, but if my life is cut short her debts will take most of them. Some of hers are more suitable for Liberia than some of mine. I wish you, therefore, to buy such when sold, and let a corresponding number of mine be sold, such as are less fit for freedom. Most of mine came by my wife. They are married together in families, and I desire the families to remain together. By getting authority from the legatees—the American Colonization Society—you will have discretionary power to manage all these matters. I have long loved the cause of Africa, and may yet live to promote it through those of her sons committed to my care. But my health seems exceedingly precarious, and for years I have been debarred by it from all active duties of the ministry.

Your brother in Christ,

L—— D——.

The answer of the American Colonization Society is sufficiently set out in the opinion of the court.

The answer of T. N. Waul, the residuary legatee, is in substance as follows:

"He admits the execution and probate of the will and codicil and the writing of the foregoing letter to Finley by the testator, and that 'it was the intention, desire and object of said Hurd, in executing the twelfth section of the will, to have his said slaves therein mentioned sent to Liberia, on the coast of Africa, and there colonized by the agency of his said legatee, the American Colonization Society.'

"Denies most positively that there was any secret agreement or understanding between Hurd and this respondent that in case the said twelfth clause of the will should be declared illegal or void, that he (Waul) would emancipate the slaves and remove them to Africa.

"Denies that the fourth clause of the codicil was coupled with any trust, secret or otherwise, different from its express terms, or that he ever agreed with Hurd to emancipate his slaves in consideration of being made residuary legatee.

"Denies that he was constituted residuary legatee with any agreement or understanding or trust, *upon his part,* that he was

to aid in the colonization or emancipation of said slaves, but believes the truth to be that the said testator, being exceedingly anxious to emancipate or colonize his slaves through the agency of the said trustees, Gray, Means and Finley, and the American Colonization Society, and fearing that some obstacle might be placed in the way by petitioners, or some other of his kindred who might feel pecuniarily interested, he resolved, as a secondary object, to place said slaves with one whom he believed would make for them a just and humane master. Be this as it may, the bequest to this respondent was to him personally, and no obligation to emancipate said slaves, in the event they came to his possession, nor ever acknowledged or imposed.

" Denies that he has ever released his interest in the slaves to the American Colonization Society or to any other person. Admits his resignation of the office and trust of executor; that the debts have all been paid, except the debt to Kirkman. Admits that Polly Cowles is next of kin.

" Respondent further answering admits that, having accepted the executorship of the said will, he faithfully desired to carry out its provisions and the *desires* of the testator, so far as they came in conflict with no law or the policy of said State of Mississippi. But if the said thirteenth clause in said will conflict with the intention of the testator, and should be held void as contrary to law and the policy of the State, then respondent sets up his claim under the fourth clause of the codicil."

He makes his answer a cross-petition, and prays for restitution according to law.

, The answer of the American Colonization Society, in addition to what is stated in the opinion of the court, charges that petitioner, Mrs. Cowles, had received the legacy left her by the will, and set up this as an estoppel for her to deny the validity of the bequest to them. On the trial that allegation was admitted by Mrs. Cowles, and the following admission was made on the part of Waul, viz.:

" It is admitted that General T. N. Waul, about the year 1848, and at a public sale made by him at the residence of the testator, made a public speech to a large number of persons present in relation to his connection with testator's estate, in which he said,

'That any person who charged that he (Waul) had claimed or ever would claim any interest in the property of testator in opposition to the American Colonization Society or its trustees, was a scoundrel and a liar.'"

The will of Hurd is dated May 31, 1846, and his codicil is dated June 7, 1846, except the seventh clause, which is dated June 23, 1846. The letter to Finley, before set out, is dated April 28, 1846. The preamble to Hurd's will states that it "was drawn up by himself the last week in April, and rewritten the last week in May, 1846. The will and codicil were probated on the 14th of September, 1846."

The material portions of the will are as follow:

By the first clause he gives a negro woman to his brother-in-law.

By the second he bequeathed to his nephew, Samuel Hurd Cowles, $500, his riding-horse, saddle, watch and "trinkets," the right to dispose of his (testator's) wearing apparel, and of his papers not needed by his executor, and also $75 to buy for himself and each of his brothers an elegant copy of Scott's Family Bible, and of the Presbyterian Confession of Faith.

3. "I do bequeath to Samuel Hurd Cowles in trust, to be paid after my negroes shall all be sold, but to draw interest annually at six per cent. from my decease, one thousand dollars, for the use and benefit of my sister, Polly Cowles, and her children, as follows, viz.: The proceeds of the $1,000 are to be paid annually to Polly Cowles during her lifetime, and at her death the principal to be divided among her children equally, or in such proportions as she may by will otherwise direct. Should she outlive her present husband, then the money is to be hers forever in fee simple, and is at once to be paid over to her."

The seventh and last clause of his codicil, dated June 23, 1846, refers to the foregoing third clause of the will, and is as follows: "I so change Article 3 of the above will by interlining that the $1,000 intended for my sister is to draw interest at six per cent., but may not be paid till the negroes are sold."

By the fourth, fifth, sixth, seventh, eighth, ninth, tenth, and eleventh clauses, he disposes of his library, his silver ware, and about six hundred and eighty acres of land not included in his

plantation, a house and lot in Holly Springs, to his nephews and nieces, and his buggy and harness and Spanish saddle to two of his friends.

The twelfth:

12. "All my property of whatever kind, not otherwise disposed of in my will, I direct my executor to sell, and to pay the proceeds to H. H. Means, Esq., Memphis, Rev. J. H. Gray, Memphis, and Rev. R. S. Finley, St. Louis, in trust, for the use and benefit of the American Colonization Society. Said trustees are hereby authorized to direct the time and manner of the sale, also the terms of sale, and the place of the sale of the negroes. The property which might fall to my heirs out of the separate estate of Mary Hurd, deceased, after its final settlement, I wish and direct my executor to dispose of according to this clause."

13. "While my slaves remain unsold I wish them to have the benefit of religious instruction by catechism, and by intelligent, sound preaching—Presbyterian if practicable. For these purposes my executor is authorized to apply out of the proceeds of their labor annually the sum of two thousand dollars."

14. "My executor has authority to sell, buy, and exchange portions of property at his discretion for the advantage of the estate, and I desire him to purchase any negroes, that may be sold out of the estate of Mary Hurd, that he may think proper, so as to keep families together."

15. "I earnestly request my executor to cause the administration of the government and discipline of my slaves to be conducted upon the principles of humanity, discretion and Christianity; the virtuous to be encouraged, and the vicious corrected or removed from corrupting the rest."

18. "I request T. N. Waul, Esq., to execute this my last will and testament, and I also nominate him as my successor in executing the will of Mary Hurd, deceased."

20. "My executor is requested to make sufficient compensation to the trustees named in section 12. Should they fail to accept or execute the trust, he is authorized to appoint others, subject to the approbation of the American Colonization Society."

The third and fourth clauses of the codicil are as follow:

3. "I desire my nephew, S. H. Cowles, to retain the manage-

ment of my branch farm, to catechise all my negroes on the Sabbath, and assist my executor in the little details of business, for which he may receive not over $300 and board for himself and horse, so long as my executor may think it necessary."

4. "I make my executor my residuary legatee, intending he shall take all my property, real and personal, that by invalid disposition, or in any other manner, shall come into the residuum of my estate, and I desire that security may not be required of him in the administration of my separate property."

The court below decreed the slaves to Mrs. Cowles, the heir. From this decree the American Colonization Society, Garnett, the administrator *de bonis non* with the will of Hurd annexed, and Waul appealed.

*J. W. C. Watson*, with whom was *W. P. Harris*, for the American Colonization Society.

This society, a corporation chartered by an Act of the Legislature of Maryland, can take, under a will in Mississippi, a pecuniary legacy. Its power to take as a legatee has been repeatedly recognized by this court. *Ross* v. *Vertner*, 5 How. Mi. 305; *Leech* v. *Cooley*, 6 S. & M. 163; *Wade* v. *American Colonization Society*, 7 S. & M. 663.

See, in connection with the prohibition against the society in the Rev. Code, *McCarty* v. *Mandiville*, 3 La. An. R. 239: "The prohibition by law of donations of a particular character *implies the right to make those not in the prohibition.*"

It has been decided that it cannot take slaves in this State, and, by an act in the Rev. Code, it is by name prohibited from taking slaves by bequest for the purpose of emancipation; but there is no decision or statutory prohibition against its taking a pecuniary legacy; and the necessary implication from the decision in the case of *Lusk* v. *Lewis* is that the Colonization Society *can take a pecuniary bequest.* In this case, after deciding that it cannot take *slaves* by bequest, the court proceeds to consider a pecuniary bequest to the society, and decides this question against the society, solely upon the ground that the payment of the money "*is dependent upon the bequest of the slaves taking effect,*" and then proceeds: "that bequest having failed, it follows

Garnett, Admr., et al., *v.* Cowles and Wife.

that the pecuniary bequest must fail with it." 32 Miss. R. 297.

The bequest in the will in favor of the society is a *pecuniary bequest.* The will could not be literally executed in any way, except by the payment to the society, *in money,* of the proceeds arising from the property, *including the slaves,* embraced in the residuary clause.

The doctrine, that a party, entitled to the proceeds of property when sold, *may elect to take the property itself,* has no application to this case. The direction of the will to sell the property, converted it into money; and until an election *not to take the money* is shown, the legacy continues a *pecuniary legacy.* In this case it is not so much as alleged in the petition, that the society has elected to take the *property* and not the *money.* 3 Wheaton S. C. R. 563. Indeed the law goes still further, and holds, that in a case like the present, when a legatee is without legal capacity to take property, but can take the proceeds arising from the sale thereof, no right of election exists; but the directions of the will are *imperative.* 14 Grattan, 251–264, and authorities there cited.

It is insisted, however, that the will falls within the prohibition contained in the *eleventh section* of the Act of 1842, Hutch. Co. 539, which is in these words:

"Hereafter it shall not be lawful for any person by last will or testament to make any devise or bequest of any slave or slaves for the purpose of emancipation; or to direct that any slave or slaves shall be removed from this State for the purpose of emancipation elsewhere," &c.

This is manifestly the only clause of the law which it is even contended bears upon the present case, so far as the rights of the Colonization Society are concerned; and certainly this will does not fall within *this prohibition,* for it does *not* "make any devise or bequest of any slave or slaves for the purpose of emancipation, or direct that any slave or slaves shall be removed from this State for the purpose of emancipation elsewhere." A provision in the will, falling within the prohibition of the law, would certainly be null and void, whether the legatee was privy to it, or concurred in it, or not. A will in contravention of the

law is void by the force and sentence of the law. But a will like the present one, which contains no provision which cannot be literally executed without violating the law, or which, according to its plain and obvious import and meaning, looking to all of its provisions, is not in conflict with the law, certainly cannot fall under the condemnation of the law, and be made inoperative and void by the law. Looking to each and all of the provisions of the will, and placing upon the entire instrument the only construction of which its language admits, it must be held that *it requires the slaves to be sold;* and whilst the trustees are empowered by it to direct the terms and time and place of the sale, still the sale is a foregone conclusion, and *must be made,* unless the directions of the will on this subject are disregarded.

But it is contended that a *trust* exists in connection with the will for the emancipation of the slaves. Such a trust is certainly *not* created by the *will,* and, if it exists at all, must be found *outside of the will.* And to establish this alleged trust, reliance is placed upon the letter written by the testator to one of the trustees, and filed with the petition as Exhibit B.

This letter does show that the testator desired the emancipation of a *part* of the slaves, but how many or which of them it does not disclose. But this letter contemplates the *sale of all of the slaves;* and it is submitted that the wish of the testator that the trustees might purchase a part for freedom, and in that way do what by law they had no authority to do, cannot have the effect of making illegal and void a will which upon its *face is legal and valid.*

The proceeds arising from the sale of the slaves having been given to the society in unqualified and absolute terms, the *wish* or *desire* of the testator, however clearly and strongly expressed, that they receive the bequest or legacy in a different form, is not obligatory upon the trustees, and especially is not obligatory upon the *cestui que trust.* And, moreover, this letter, looking to the whole of it, was not intended to be imperative or mandatory. The testator himself, in the letter, defers to the rights and paramount authority of the legatees, and intends that his wishes shall be carried out only with the consent and the concurrence of the legatees, the American Colonization Society.

After making known what *his desires were*, he refers the trustees to the legatees in terms which show not only that *they* were to be *consulted*, but that *they* were to *decide* whether or not *his* plans and views were to be carried out. His language is:

"By getting *authority* from the *legatees*, the American Colonization Society, you will have discretionary power to manage all these matters."

The *authority* then which the testator wished the trustees to exercise in the premises was not communicated or attempted to be communicated by the testator himself, but, if conferred at all, was to be derived from the legatees, the American Colonization Society.

That the case made by the will and the letter together does *not* in law constitute a *trust*, see the following authorities, to wit: Hill on Trustees, 71, 72; *Young* v. *Egans*, 10 La. An. R. 415, 417, 418; *Hawkins* v. *Hawkins*, 13 B. Mon. 245; *McLeash* v. *Burch*, 3 Strob. Eq. 225.

Surely it cannot be held that a *wish* or *desire*, on the part of a testator, that his slaves, which he bequeathed by his will, may be emancipated by the legatee, of itself brings the will under the prohibition of the statute. Where by the will a bequest is made which vests title in the legatee which the testator shows he intended should confer dominion and authority over what was given, and clothe the legatee with the rights and attributes of ownership, it must be that all *trusts* are excluded, however plainly it may be made to appear that the testator had *wishes* upon the subject of the bequest, which he hoped or desired might or would be respected. And if *this* is but the case made by the letter to Finley, when taken in connection with the will, it is submitted that there is nothing in it falling within the prohibition of the statute against emancipation. To hold that such a case falls within the prohibition of the statute is to attribute to the statute an efficacy which not only annuls and makes void wills emancipating or directing the emancipation of slaves, but also wills which do not in law attempt to bring about any such results.

The North Carolina cases may all be divided into three classes:

1. Those in which the wills or deeds were held void because of the *legal incapacity* of the legatee or grantee to take.

2. Those in which, *upon the face of the will* ordered, it was held that *a trust* arose which was illegal, and therefore void.

3. Those in which the will or deed was absolute upon its face, but in which a secret, illegal trust was established by proofs *aliunde.* And in establishing such secret trust, some express or necessarily implied promise or agreement of the grantee or legatee is shown to have existed.

Now it is submitted that the present case falls within neither one of the foregoing classes. The Colonization Society *has* capacity to take a pecuniary legacy; upon the face of the will there is no illegal trust created. Let the will as written be fully carried out, and the slaves will be sold and left remaining in slavery, and the society will receive a sum of money, the proceeds arising from the sale of the slaves and the other property embraced in the residuary clause. And finally, there is no testimony establishing *a trust* for the emancipation of the slaves. The letter to Finley is not in its terms mandatory, but recognizes the power in the society to agree or disagree to the purchase by the trustees of a part of the slaves for the purpose of emancipation. The letter certainly contemplates a sale of *all* of the slaves, and only of the purchase of a part by the trustees. It is confidently asserted that, were the emancipation of slaves legal, and under no prohibition, and had the testators made the letter a *codicil* to his will, which had been only probated, that it would not be held that it created *a trust.* Whilst the letter clearly expresses the intention and wishes of the testator as to what he desired *should be* done, it fails to make his wishes and intentions obligatory upon the legatee. The letter looks to the *consent* of the legatee to the proposed arrangement, (and this consent was in no way secured or stipulated for,) and in the absence of such consent such wishes and desires on the part of the testator cannot be held to create *a trust.*

Suppose the wishes and intention of the testator to have been consistent with law, and that, upon hearing of the will and supposed codicil, the legatee had remained passive before the estate was in a condition to be distributed, or had even acquiesced in such wishes and intentions, but, before they were carried into execution, or the *beginning of their execution* had been reached,

the legatee had decided to demand the sale and proceeds of the property, would not such decision have settled the question, and cut off all pretence of any obligatory trust upon the legatee?

I cannot comprehend how an illegal wish or intention on the part of a grantee or testator, however strongly expressed, can fall within the prohibition of the law, when he does not give to this illegal wish or intention the form or substance of a deed or will. The law does not undertake to act upon wishes or intention when they stop short of the point of being actually developed in a practical form, or at least until the attempt is made to do this. In the present instance, this line, it is insisted on, was not passed by the testator. He did not, by his will, or the letter, attempt to emancipate his slaves. He left them in slavery, and parted with his dominion over them as slaves, and left it *for another to emancipate or not* some of them, *as this other might finally* determine. The purpose of emancipation existing only in the form of a *wish* expressed by the testator, was and still is inchoate; and what was requisite to complete in *intention only*, this purpose, was left *to be done* or *not done*, as an independent and self-willed free agent might subsequently upon its own volition determine upon. The Colonization Society, under the circumstances of this case, has over the slaves in question no more power, and it was not intended to give it more power, over them, than it has over other slaves belonging to any Mississippi planter which may be for sale. The society has, indeed, no power to acquire slaves; but if it had the power, it could only acquire these slaves, as it could other slaves, by taking the money to pay for them out of its treasury. This is really the practical state of the case. To buy property, when you are entitled to the proceeds of its sale, another being the purchaser, is to part with the price of it in money. No case has been produced, and, so far as I know, no case exists in which the will or deed directed a sale of the slaves, and the proceeds paid over, and still the instrument was held to be within the prohibition of the law. That such a case would fall under the condemnation of the statute, upon proof that the donee or legatee, having the power to do so, agreed with the grantee or testator that, instead of receiving the proceeds of sale, he

would buy and emancipate, may be conceded; but in the absence of such agreement by which the donee or legatee became a party to the secret trust, it certainly cannot be that the deed or will would be held void. Bishop on Criminal Law, Vol. I., p. 257, says:

"Men may *deserve* punishment because they intend a wrong; they *are punished* for the wrong intended, only when an act has been done, whereby society is *supposed to have suffered.*"

The testator, neither by his will or letter, did an act whereby society can be "supposed to have suffered." Taking both together, he only *requested another to do this act*, leaving this other, however, free to do or not to do the act desired or requested to be done.

I find that I have again returned to the consideration of the letter in connection with the will, and thereby fallen into some repetition. All knowledge of the letter in the lifetime of the testator is, however, expressly denied by the Colonization Society, and there is no testimony tending to disprove this denial. See *Thompson* v. *Newlin,* 3 Tredill's Eq. R. 338–343; *Hoze* v. *Hoze,* 1 Watt. 163, 214–216.

There is no allegation in the petition, or proof in the case, tending to show that the Colonization Society has done any thing since the death of the testator, or at any time, by which, in law or in morals, it is or should be estopped from claiming the sale and proceeds of all the property included in the residuary clause of the will.

*Fisher & Armistead,* and *Yerger & Rucks* for Waul.

The controversy in this case arises upon the will of Samuel Hurd, deceased.

Three parties claim the property in different rights. The American Colonization Society claim under the twelfth clause of the original will.

General Waul's claim is founded on the fourth clause of the codicil.

Cowles and wife claim as heirs at law and distributees adversely to both claimants under the will.

The will has been duly probated. By the twelfth clause the

testator directed his executor to sell all his property not other-wise disposed of, and to pay over the proceeds to three trustees, for the use and benefit of the American Colonization Society, giving to the trustees power to "direct the time, manner, place and the terms of the sale of the negroes."

By the thirteenth clause the testator expressed his wish that his slaves should have the benefit of religious instruction by catechism and intelligent, sound preaching, Presbyterian if prac-ticable, while they remain unsold, and he appropriated two hun-dred dollars a year to that purpose.

After the date of the will the testator wrote a letter to Finley, one of the trustees, informing him of the execution of the will, and that his purpose in making it was to emancipate his slaves and procure their removal to Liberia, and he had adopted this mode of devise for the purpose of enabling him to do so; in-forming Finley at the same time that the laws of Mississippi prohibited the emancipation of slaves by will, a fact which he says should be generally known.

The Colonization Society by its answer admit it "to be true that it was the intention of said decedent, Samuel Hurd, to have his slaves sent to Liberia, on the coast of Africa, and there colo-nized by its agency."

This admission on the part of the Colonization Society re-lieves us from the necessity of establishing, as we could readily have done from the original will and the letters of the testator to Finley, that the object and purpose of the bequest to the Coloni-zation Society was the emancipation of his slaves and their removal to Liberia. This admission in the answer is fatal to the claim of the Colonization Society, and deprives them of all right in the premises.

Prior to the year 1842 it had been decided by this court that a direction by a testator that his slaves should be removed from the State to Liberia and then set free, was a valid trust not opposed to the policy of this State, and which a court of equity would compel the executor to carry into effect. *Ross* v. *Vertner,* 5 How. R. 305.

In the year 1842 the Legislature of this State declared a new policy, and by the eleventh section of the Act of February 26,

1842, in relation to free negroes and mulattoes, it was enacted that "Hereafter it shall not be lawful for any person by last will or testament to make any devise or bequest of any slave or slaves for the purpose of emancipation, or to direct that any slave or slaves shall be removed from this State for the purposes of emancipation elsewhere."

Counsel for the Colonization Society seek to avoid the effect of this statute in the present case by the suggestion that the will on its face does not purport directly to emancipate the slaves, but orders their sale and the payment of the proceeds to the Colonization Society; and they insist that the Colonization Society, being capable of taking pecuniary bequests, are authorized to take, in the present instance, regardless of the purposes and intent of the testator, because they say the Colonization Society "did not have any knowledge or participation in the creation of any trust, secret or otherwise, growing out of the will prior to its execution or to the decease of the testator."

This argument, though specious, is not sound. The policy of the State, as indicated by the Act of 1842, was to prevent the emancipation of slaves by will, and to that end it was declared to be unlawful to make any will for the purpose of emancipation. By this Act the testamentary power or capacity of the testator to emancipate was taken away. The statute declares any will made for the purpose of emancipation to be unlawful. In the present case the Colonization Society admit that the purpose for which the will was made was the emancipation of the slaves. It is therefore evident that the will is obnoxious to and in direct conflict with the provisions of the statute.

The Colonization Society are mere volunteers; they have no right and can have none, except under the will, and if the will is invalid, either because of informality in its execution, want of testamentary power in the testator, or illegality in the purposes for which it was made, the Colonization Society can of course acquire no right under it; for no rule of law is better established than this, that no right can be acquired by any one by virtue of any devise, contract, or agreement, which is prohibited by law. The question of knowledge or participation by the grantee or devisee in cases of this kind does not arise. The statute declares

the devise void on account of the purpose for which it is made, and contains no exception in favor of devisees ignorant of the purpose of the testator; and as it contains none, and as the devisees are mere volunteers and can claim only in virtue of a will lawfully made, the courts can create no exception in their favor.

This principle has been fully recognized by this court in several cases arising under the Statute of Frauds. In the case of *Harney* v. *Pack*, 4 S. & M. 229, the court held that "a deed of trust was void if made to secure an antecedent debt, and with fraudulent intent by the grantor, although neither the trustee nor the *cestui que trust* participated in the fraudulent intent, and the fraud of the grantor was not disclosed upon the face of the deed." See also *Farmers' Bank of Virginia* v. *Douglass*, 11 S. & M. 469; *Bogard* v. *Godley*, 4 S. & M. 302. The principles contained in these cases are conclusive in the present.

Any other rule would in fact defeat the obvious intent and policy of the law. The statute strikes at the testamentary capacity and power of the testator. It declares a will made for the purpose of emancipation to be unlawful, and if unlawful it can of course confer no right.

The cases cited by counsel in which the rule has been established that absolute devises will be upheld in favor of the devisee where there was a secret wish or trust expressed by the testator, unknown to the devisee and *dehors* the will, can have no applicability to cases arising under statute like the Act of 1842, in which an act done or devise made for a particular purpose is declared to be unlawful and is prohibited. It is the "*unlawful purpose*" which avoids the will, not the knowledge or participation of the devisee in that purpose.

In the present case it is clear that the testator intended to give nothing to the Colonization Society except to be used for his slaves. It was their emancipation and removal to Africa which he designed to effect by his will. . That was the purpose for which the will was made, and being made for an illegal purpose it is void. The principles laid down by this court in *Lewis* v. *Lusk*, 32 Miss. and 34 Miss. R. and in *Mitchell* v. *Wells*, fully cover this case, and decide against the Colonization Society.

This brings us to the consideration of the claim of General Waul.

By the fourth clause of the codicil, which bears date June 7, 1846, the testator makes his executor his residuary legatee, using the following language in relation thereto: "Intending he shall take all my property, real and personal, that by invalid disposition or in any other manner shall come into the residuum of my estate." A broader or more unqualified residuary bequest could not be made. As early as the case of *Vicks, Exr., v. McDaniel,* 3 Howard, 337, it was held by this court that the residuary legatee is entitled to take whatever may by lapse, invalid disposition, or other casualty fall into the residue after the date of the will.

Some controversies arose in this court between the heir at law and the residuary legatee, and in the case of *Lucky* v. *Dykes,* 2 S. & M. 60, it was decided that if the residuary bequest referred to a *particular* fund, the heir at law would take, in preference to a *specific* residuary legatee, any other portion of the estate which by invalid disposition did not pass under the will; thence no doubt the residuary clause in the present instance used the broad and comprehensive language contained in it in order to manifest the testator's intention to bestow his *entire estate*, not otherwise specifically and legally disposed of, to the residuary legatee in exclusion of the heir at law.

The suggestion that the bequest to General Waul was made also for the purpose of securing the emancipation of the slaves is absolutely denied by Waul, and there is no proof in the record which tends to prove it. It is true General Waul stated at one time subsequent to the making of the will that it was false that he ever had or intended setting up his claim in opposition to the Colonization Society. But in this there is nothing inconsistent with his right to set up his claim. He knew that the primary intent and purpose of the testator was if possible to manumit his slaves, and he may have felt, and no doubt did feel, that as a man of honor it was not incumbent on him to assert his *legal* rights under the will in opposition to the known wishes of the testator, if there was any legal method by which those wishes could be carried into effect.

In the testator's desire to manumit his slaves, there was nothing *malum in se*, and the residuary legatee could therefore leave the question of his rights to the property to be settled by the courts of the country, without any active opposition being made on his part to the claim of the Colonization Society.

His delay or passiveness in asserting his claims, as long as the right is not barred by the Statute of Limitations, is no bar to his right now to assert it. Mere delay on his part cannot confer a right on the heir at law, or distributee to the property. If the residuary legacy was valid at the death of the testator, the passiveness in the residuary legatee to assert his rights cannot have changed its character.

The question then turns upon this point, Was the residuary legacy valid at the death of the testator? As a matter of fact, if the residuary legacy was made for the purpose of securing the emancipation of the slaves, then the residuary legacy would be subject to the same objections as the bequests contained in the original will. But, as before remarked, there is no proof that such was the purpose; and this court will not indulge in mere vague suspicions and hypothetical and imaginary purposes and intents, for the purpose of defeating the claim of the residuary legatee, in the absence of all proof showing an illegal purpose on the part of the testator.

It is admitted by the counsel for the heirs at law that, by the law as it existed prior to the Act of 1842, the residuary legatee would have been entitled to the property in controversy in the event the bequest to the Colonization Society is declared invalid. But it is said that Act has made a change in the law, and that under it all invalid bequests of this character go to the heir at law.

Such we conceive not to be the rule under the Act of 1842. That law was intended to apply to two classes of wills, and to remedy an evil in two classes of cases. First, the object of the law was to prevent the emancipation of slaves, or a trust, directing their removal from the State, for the purpose of emancipation, under wills made after the passage of the Act.

Secondly, to prevent the removal of slaves who, by wills made prior to the Act, were directed to be removed from the

State for emancipation, unless their removal was effected within the specific period pointed out by the Act.

In all wills made subsequent to the Act, there was no necessity for legislation relative to the property, because, in relation to them, the rule had been well established, if there was a general residuary legatee, he became entitled to the property, which by reason of its invalid disposition could not pass to the specific legatee. And if there was no residuary legatee, it fell as a matter of course into the general residuum, and became the property of the heir at law.

But in relation to the second class of wills, legislation became absolutely necessary. These wills had been declared valid by the courts, the title to the property under them passed to the devisee, and the rights of the heir at law were entirely destroyed by the will. In the event of the failure by the executors or trustees to remove the slaves as required by the Act, the question was naturally presented to the Legislature, what shall become of them? By a valid bequest, the heir at law, has been deprived of his right; so, too, has the general residuary legatee. Shall these slaves then become the property of the State by forfeiture or escheat, or what other disposition shall be made of them? This the legislation answered by declaring that such slaves, held under the provision of *such* will, should descend to and be distributed amongst the heirs at law of the testator, or be otherwise disposed of, according to law, in the same manner as if such testator had died intestate. It certainly was no purpose of the Legislature to change the well-established rule, relative to the rights of the general residuary legatee and heir at law, arising under wills made subsequent to the Act. The whole purpose and intent of the law was to prevent the emancipation of slaves by last will and testament. No reason of state, no legislative policy, required a change in the general rule regarding the rights of the residuary legatee and heir at law. Every testamentary capacity existed subsequent to the Act which existed prior thereto, subject to the exception specified in the Act itself. It was made unlawful for a testator to direct the removal of his slaves for emancipation, but it was not made unlawful for him to make any and every other bequest of his property. If the Legislature had intended to have

made so great a change in the construction of wills and the rights of residuary legatees, it is impossible to conceive that they would have left this great change to depend upon judicial construction, and that too a construction in which it is admitted "would appear at first view that the provision had reference only to wills made before the passage of the Act."

If this Act was now for the first time before this court, we think there would be no hesitancy in giving the Act the construction we contend for. But it is said the decisions of this Court in *Reid* v. *Manning*, 30 Miss. R. 308, and *Lusk* v. *Lewis*, 32 Miss. R. 297, are opposed to it. Every opinion of this court is to be taken with reference to the particular facts on which it is made. But when a different case, arising upon a different state of facts, is presented to the court, this court will feel bound to apply the rules of law applicable to it, and will not feel bound by the general language of a previous opinion, made on a different state of facts.

In none of the cases heretofore decided by this court and cited by counsel for the next of kin, has the contest arisen between the residuary legatee and the next of kin under the Act of 1842. Nor can the court in the general language used by it be considered as deciding against the rights of the residuary legatee, when that question was not presented for their consideration.

In the case of *Reid* vs. *Manning* there was no residuary legatee; the question then presented simply was, whether or not a bequest to the testator's wife of all his property absolutely was revoked by a codicil giving to her a life-estate on a certain contingency, and bequeathing freedom to his slaves on the happening of that contingency. And the court decided that it did, and necessarily gave the property to the next of kin, inasmuch as there was no residuary legatee. So, too, in *Lusk* vs. *Lewis*, in 32 Miss. R. 297, the sole question was between the trustee for emancipation and the next of kin, and not between the residuary legatee and the next of kin. But when this case came before the court a second time, 34 Miss. R., this court upheld the residuary bequest to the extent contained in the will. So, too, in *Mahorner* v. *Hooe*, 9 S. & M. 247, this court adjudicating upon the Act of 1842, it was decided that under the Act of 1842

the residuary legatee will take in exclusion of the heir at law. The language of the court is as follows: "The trust fails in part because of its illegality, and if the will had been silent as to any further disposition, of course the heir could claim so much of the fund as would have been requisite to carry out the illegal purpose. But the will disposes of the residue, if there should be any, and thus takes the case out of this principle. It declares that if there should be any surplus of money, it shall go to Mahorner and Yeatman." This case settles the question now before the court in favor of the residuary legatee. Judge Clayton delivered a dissenting opinion, but recognized the correctness of the rule laid down by the majority of the court, saying, "The difference between him and the majority of the court is a difference as to the application of an acknowledged principle, not in relation to any principle itself." We therefore contend that in the only cases which have arisen in this court in relation to wills made since the Act of 1842, when there was a residuary legacy, the court have maintained the will in favor of the residuary legatee. Nor are decisions in cases where there was no residuary legacy, and no necessity of deciding between a residuary legatee and the next of kin, rules of decision where such contest does arise. We would further remark that if it be true that General Wall knew that it was the purpose and wish of the testator by the bequest to the Colonization Society to emancipate his slaves, yet his knowledge that such was his purpose and intent in reference to that bequest cannot affect his rights under the codicil, which rights are bestowed upon him upon the possible contingency that the first desire and primary intent may be held and declared to be unlawful. The codicil was made at a different time from the original will, and proved by different witnesses, and shows that the testator had in view the possibility that the bequest contained in the original will

---

[This case was reported before the war, but two pages of this brief were lost during the war, and the loss was not discovered until the MSS. was going through the press.—REPORTER.]

*J. Z. George* and *F. M. Aldridge,* for appellees.

The questions presented by the record in this case are, 1st, Whether it appears from the face of the will of Samuel Hurd, deceased, that he bequeathed his slaves for emancipation; and if not, 2d, Whether it is shown, by the pleadings and proof, that the bequest was so made; 3d, Whether appellees, having accepted a legacy under the will, are estopped from contesting the legality of the bequest of the slaves; 4th, Whether the heir, under the operation of the 11th section of the Act of 1842, takes slaves bequeathed for emancipation, in preference to the residuary or an alternative legatee; and if not, 5th, Whether it is shown by the record that the testator bequeathed the slaves alternatively to Waul, his residuary legatee, in secret trust for emancipation. We shall discuss these questions in the order above stated.

1. And first, we insist that it appears plainly from the face of the will, that the slaves were bequeathed in trust to the American Colonization Society, to be removed by them and emancipated. The most prominent characteristic in the will is the great solicitude of the testator for his slaves. In no less than four distinct clauses, he makes special provision for their future temporal and spiritual welfare. By the thirteenth clause he makes provision for their religious instruction during the time they shall remain unsold and under the control of his executor, stating even the peculiar faith or doctrine he desired to be taught to them. By the fourteenth clause he provides for the purchase of other slaves *so that families might be kept together ;* by the fifteenth he " earnestly requests" his executor to govern his slaves on the principles of humanity and Christianity, and directs him to "encourage the virtuous and to correct or reform the vicious, or remove them from corrupting the others;" and finally, by the third clause of the codicil he selects a particular agent (his nephew, Samuel H. Cowles) to manage his slaves, and directs him to catechize them *all* every Sabbath.

These clauses indicate clearly that the testator was deeply attached to his slaves, and that their temporal and spiritual welfare after his death was the subject of his most earnest solicitude. They further show that he was not satisfied to leave them in a condition of legal slavery, because under our system all these.

matters are necessarily left, in the main, to the discretion and humanity of the master.   His frequent reference to the subject, both in the body of the will and in his codicil, (which last was drawn up a short period before his death,) authorizes us to say that the amelioration of the condition of his slaves is the most prominent idea in the will, and its main intent and object.

It also appears that the will was drawn up by the testator himself, and its contents show that he was a man of more than ordinary intelligence, and well acquainted with legal forms and phrases. The fourth clause of the codicil makes it manifest (what would otherwise, however, be presumed) that he was well acquainted with the law and policy of this State prohibiting emancipation, and was conscious that he had made an illegal bequest, and was apprehensive that his illegal purpose would be discovered and thwarted.

By the light furnished by these several clauses, we are to read and interpret his meaning and intent in the twelfth clause, which is the only remaining clause in which his slaves are noticed or mentioned.   This clause is residuary in form, and devises and bequeaths all the remainder of his estate, real or personal, (including forty or fifty slaves,) to three persons, in trust for the American Colonization Society, and directs that the property so bequeathed shall be sold, and the proceeds paid to the trustees for the benefit of the society; and it further provides that the terms, time and place, and manner of sale of the slaves shall be prescribed by the trustees.   This clause it is insisted provides merely for a pecuniary bequest to the society; on the other hand we insist that it manifestly appears to be a cunningly-devised scheme to evade the provisions of the Act of 1842, and to give to the society by indirection what he could not give directly, viz., his slaves for emancipation.

The testator, in drawing up this clause, must have been influenced by either one of two objects—either a desire to confer a benefit on the corporation, or on his slaves.   The construction contended for by the counsel for the society is based upon the former supposition; ours on the latter.   We think it can be demonstrated that the object was not to confer a benefit on the corporation.   If that had been the object, most of the provisions of

Garnett, Admr., et al., *v.* Cowles and Wife.

the twelfth clause are unnecessary and insensible; and the machinery devised is inappropriate and unequal to the end in view. If the pecuniary benefit of the society was intended, then the end to be accomplished by a sale was manifestly to raise the largest sum possible. But the terms, time and place of sale of the slaves are left to the discretion of three trustees residing in distant States—a duty which could have been better performed by his executor. Two of these trustees, moreover, as appears from the will, were ministers of the gospel, and, from the nature of their calling, presumptively unfit to discharge the duties assigned them, upon the theory we are combatting. Again, if the object was simply to confer a pecuniary favor, why have trustees at all—why appoint three men to receive money from the executor and hand it over to the society? And in case of their failure to accept the trust, why provide for the appointment of others, and for compensation to be paid to them for the performance of so simple and unnecessary a duty?

On the other hand, if the object was, as we insist, to have a mere formal sale of the slaves, and under cover of bequeathing the proceeds of the sale to provide that the slaves themselves should go to the society, then the machinery provided was appropriate and well adapted to the end in view. For if the sale had taken place in this State, the purchase could not have been made either by the society or for them by the trustees, and hence it was proper and right to authorize some one to designate a place where such purchase could be made; and what more appropriate agents than citizens of other States whose laws were unlike ours, in this respect, and ministers of the gospel devoted to the colonization of slaves in Africa? The gift of the price of the slaves was in effect a gift of the slaves themselves in every locality where the society would be permitted to own that species of property.

The construction contended for by opposing counsel is also in direct conflict with the anxiety of the testator for the welfare of his slaves, manifested so clearly in other parts of his will (and wherever they are mentioned) before referred to. No directions are given as to the mode or plan of sale; the trustees might sell them singly in the slave mart at Richmond, Charleston, or New Orleans—thus separating husband and wife, mother and infant,

and consigning them to such associations, corrupting or otherwise, as fortune or fate might provide.    As before seen, the time of the sale was to be appointed by the trustees.    This might be sooner or later, at their discretion.    In the mean time, though it is not expressly so stated, yet it is plainly inferrible, that the testator intended that his slaves should be kept together and worked on the farm.    The time in which they were to be so employed, from the nature of the trust, it was evidently contemplated by the testator, would be short, yet he thought it proper and necessary to give these special directions above named as to their treatment and instruction, and the conservation of their morals, during the short period which was expected to elapse before the sale.    According to the position of counsel, he intended ever afterwards that these objects of his affection and care and solicitude should be left to the tender mercies of whosoever might purchase them, and that families brought together by purchase after his death should be soon thereafter separated—it might be forever.

This construction puts the testator at cross-purposes with himself, and is repugnant manifestly, and clearly so, to his intentions and feelings in reference to his slaves as indicated by the other clauses of his will.

On the other hand, the general provisions of his will in reference to his slaves are well calculated to carry out and are wholly subservient to his design, as alleged by us.

. If his purpose was emancipation and colonization, it was eminently proper that his slaves should be educated for liberty ; and that they should be taught the principles and habituated to the practices of Christianity.    And since it is a favorite plea for the scheme of colonization, that thereby the spread of the Christian religion among the heathen of Africa, through the agency of free negroes sent thither, would be greatly facilitated, it becomes important, in the view of the testator, that his slaves whom he had destined to the mission of Christianizing that land, should be converted to the peculiar tenets of religious faith deemed by him to be true.    It was also proper that the virtuous should not, during the period of their probation, be corrupted by associations with the wicked and vicious, and that families should be gathered

together and so kept, in order that a part might not be sent to that far-distant land, and the remainder left in servitude. See *Huckaby* v. *Jones*, 2 Hawks R. 120; *Stevens* v. *Ely*, 1 Dev. Eq. R. 493.

Again, the character of the legatee, its previous history, purposes and objects, clearly indicate the intent of the testator in making the bequest. The object of the society is to colonize free colored persons in Liberia, and to facilitate emancipation in the Union. See *Lusk* v. *Lewis*, 32 Miss. R. 297. A bequest to this society is, therefore, a bequest not only to assist the colonization of free colored persons, but to facilitate the emancipation of slaves. Whoever gives money or other species of property to the society necessarily indicates a preference for the emancipation of slaves, and to the extent of the value of the gift contributes to that end. The act, therefore, of making the gift proves that, in the opinion of the donor, slavery is not the normal condition of the African race, but is a privation of their natural rights; and further, that freedom conferred, is a blessing to the freed man. It is therefore established by the clause under consideration, that the testator was favorable to negro emancipation, and that he entertained the opinion that servitude was a curse, and freedom a blessing to the African. He owned slaves, who had faithfully served him through life; he was deeply attached to them, and felt the liveliest solicitude for their welfare; he provides in his will for their comfort, and as he *supposed* their happiness; he gives such directions concerning them as were proper and appropriate for their prospective emancipation; he is attached to relatives to whom he makes bequests in his will: but notwithstanding all this, according to the position of opposing counsel, he deliberately disinherits his kindred, and abandons his slaves by ordering them to be converted into money, to confer on others of their own race, and to whom he was a stranger, the great boon of freedom.

This reasoning, we think, proves that, from the face of the will, it appears that the bequest of the slaves was for the purpose of emancipation. But if a doubt exists on this point, it will be removed if we consider the circumstances surrounding the testator, when he wrote the will, as explanatory of its object.

We refer to the evidence in the record as to these matters, not with the view of proving at this time a secret agreement to emancipate, but only so far as it may be competent under the general rules of law to elucidate the meaning of the will.

"For this purpose, evidence is admissible of the nature, situation or qualities of the thing mentioned, * * * and in case of a will, of the testator's family and affairs, of his profession or calling, of the general state of his property, his position with reference to the objects to which he refers, or of other circumstances in which he was placed, and knew himself to be placed;" "for it was with a full knowledge of these circumstances that he made the will, and it is only by the same kind of knowledge that the court is enabled to interpret his words." 2 Phil. Ev. 735, and note, (last edition, in 3 vols.)

The letter written to his trustee Finley declares these circumstances : that he procured his slaves by virtue of his marital rights; that his wife had previously died, and had *willed hers to Liberia;* that his slaves and hers had intermarried, and that he was deeply devoted to the "cause of Africa," as he terms it, and hoped to promote it through those of her sons committed to his care. It further appears that his wife's estate was in debt, and that he apprehended that most of her slaves would be taken to pay her debts; and that he well knew the laws of the State prohibited emancipation; and finally, that he was capable of conceiving the design to evade those laws, and was desirous of doing so. With these circumstances in view, can it be doubted that the true construction of the clause is to emancipate his slaves under cover of a sale, and a bequest of the proceeds to the Colonization Society? It was his negroes he intended should go to Africa; the slaves with whom he had lived, and to whom he had become so deeply attached. But the answer confesses that it was the purpose of the testator to liberate his slaves, through the agency of the twelfth clause of the will. A party is bound by words in that sense in which he knows the party, to whom they are directed, understood them, and so *vice versa.* Here we allege an intent and a scheme to evade the statute, to do an illegal act, and to subvert the policy of the State. To be effectual, the scheme must be accomplished by indirection. In

such case, we can always show directly by proof, that it was the intention of the parties to violate the law; we are not bound by the terms of the instrument, but may aver and prove directly what was the real meaning of the parties. See *Com.* v. *Pope*, 3 Dana (Ky.) R. 418.

2. We come now to the proof that there was a secret trust to emancipate. In addition to what is. before stated, we introduce the letter to Finley, written in April, 1846, and published by the latter in the *Liberia Advocate*, a paper devoted to the cause of the Colonization Society. This fully discloses the purpose of Hurd in making his will. But the answer says that the Colonization Society was no party to the trust during Hurd's lifetime, and is only bound by its acquiescence since. If it were essential (which we deny) to show that the society was a party to, and accepted the trust in the lifetime of the testator, it can be conclusively established. The society had been in existence under its present charter for ten years when the will was made, and for a much longer period under a previous charter. Its object professedly was to build up a negro republic on the coast of Africa, by colonizing there the manumitted slaves of this country. It was expressly authorized by its charter to take bequests of all kinds of personal chattels, including negroes; it was incompetent to hold negroes as slaves or to sell them as merchandise, but only to take for emancipation. *Lusk* v. *Lewis*, 32 Miss. R. 297. It had been avowedly for a number of years engaged in colonizing and emancipating slaves left to it by will for that purpose, and it was notoriously under the control and management of men who were unfriendly to the institution of slavery in the Southern States. The society "afforded an opportunity to such persons as owned slaves and desired to emancipate them, to do so, without being subject to the evils of the free colored population among us; hence the establishment of the society had a tendency to encourage emancipation, if indeed that was not an object within the especial contemplation of the institution. Its operation was calculated strongly to promote emancipation, and it may therefore be regarded as founded on a principle not consistent with the growth and permanency of the institution of slavery; for it cannot be supposed that an effect so obvious was

not intended as a part of the system." *Lewis* v. *Lusk*, supra. *Wade* v. *Am. Col. Society*, 750 M. 694, 695. The history of the society had shown that it was principally engaged in the colonization of slaves recently emancipated, for it had become manifest that the wholesome restraints and discipline of slavery rendered those who had been habituated to it much better fitted for the establishment of the new empire than the idle and dissolute free negroes of the country.

This is a part of the history of the country. The society then may be regarded, as in case of common carriers, inn-keepers and the like, as having come under a precedent obligation to the public, or as having made an express promise to each slaveholder in the Union that it would faithfully carry out, when provided with the means to do so, any trust of the character indicated by the testator to Finley.

A devise of slaves to a society of Quakers who were proven to have had conscientious scruples about slavery has been held in North Carolina to be a bequest for emancipation.

See *Trustees* v. *Dickinson*, 1 Dev. Law R. 184–202; and see particularly, *Redmond* v. *Coffin*, 2 Dev. Eq. R. 437. See also *Huckaby* v. *Jones*, 2 Hawks R. 120; *Stevens* v. *Ely*, 1 Dev. Eq. R. 493; *White* v. *White*, 1 Dev. Law R. 260; *Thompson* v. *Newlin*, 3 Iredell Eq. 338; *Leonard* v. *Peoples*, 6 Iredell Eq. 137; *Green* v. *Lane*, Busby's Eq. R.

But it does not require an express assent on the part of the legatee to carry out the secret trust. He is bound by his silence and acquiescence. *Byrn* v. *Godfrey*, 4 Ves. Jr. 6. Here was a reception of the letter to Finley before the testator's death, and its publication in the *Liberia Advocate*, and no objection made to the trust. Here is also the acknowledged desire of the society, and its determination to carry out the trust for fourteen years after the testator's death; and the further fact that it now renounces the trust only when the heir seeks to defeat what they and the testator had determined to do, and what they had endeavored to do for that long period of time. Could there be stronger ground to imply a promise to carry out the trust? To permit the society now to renounce the trust and thus to escape the penalty of the law, would be in effect to repeal the statute.

Garnett, Admr., et al., *v.* Cowles and Wife.

So long as they are not interfered with, they attempt to carry out the trust, to violate the statute, and to subvert the policy of the State; but when their illegal purpose is discovered, and the penalty of the law is about to be inflicted, they renounce the trust and claim the property. This is but the attempt of the thief, when caught in the possession of stolen goods, to relieve himself from the consequences of his crime by a confession that he stole them in the first instance, and a proposition to renounce his title by the theft and to give up the goods if he can receive their value in money. It is of but little importance to the thief whether he receives the goods or their value; and it is of no interest to the society whether they receive the negroes or their value. But it is insisted that the bequest, when construed literally, is lawful; that is, that the society shall take the money, and not the slaves, in specie, and that, as it was the design of the testator that they should have one or the other, the court will allow them to take in that form in which it is lawful for them to enjoy it; and for this position, *Dunlap* v. *Hammour's Exors.*, 14 Grattan, 251, is relied on.

The statute on which that decision is based is as follows: "No free negro shall be capable of acquiring (except by descent) any slave, other than the husband, wife, parent or child of such free negro." Code of 1849, 458, § 4.

This case is plainly distinguishable in principle from the Virginia decision. The Virginia statute was not based upon any policy of that State which had reference to the status of free negroes or slaves outside of the limits of that State, or the permanency of the institution of slavery in the Union. Both emancipation of slaves in that State and their continued residence there are openly recognized by the Act in which the clause under consideration is found. The residence of free negroes there is lawful, and the right to own and control in that State all manner of property, except slaves, is guaranteed by her laws; nor does it appear to be unlawful that free negroes resident in Virginia should own slaves elsewhere. Hence, when the testator bequeathed his slaves to a free negro resident in Virginia, and, if that could not be done, then that the slaves should be converted into money, which they may own, and which they

cannot *convert* into slaves in that State in violation of its laws, it was perfectly proper to hold that the legatee should take the legacy in money. In that will there was no attempt to violate law, and no scheme to subvert the policy of the State by indirection—no effort, at all events, to make the free negroes the owners of the slaves, but it was a provision for a *bona fide* sale of them in case the legatee could not hold directly. Here the case is different. There is no provision openly and fairly on the face of the will that the legatee should take the slaves. This it was conceded by the testator could not be done; but the provision is, that, *under color of a sale,* the legatee at all events should take the property in specie. Here the sale is not an alternative direction, to be pursued in case the testator was mistaken as to his right to bequeath the slaves directly, but it was the means designed, confessedly so, to vest title to the slaves in the society; and if this court should sustain the position of the society, there is no possible means to prevent the carrying out of the original unlawful design. If the sale is made in pursuance of the will, the slaves may be carried from the State, sold and purchased by the society, and emancipated, which was the very thing the statute was passed to prevent. The statute is nugatory if it can be avoided by this subterfuge.

But the society cannot take the pecuniary bequest, or any other bequest, by the laws of this State, since the passage of the Act of 1842. It was declared by this court, in *Lewis* v. *Lusk,* "that the operation of the American Colonization Society" was calculated strongly to promote emancipation, and it may, therefore, be regarded as founded on a principle inconsistent with the growth and permanency of the institution of slavery, for it cannot be supposed that an effect so obvious was not intended as a part of the system." The policy of this State is not only against emancipation here, but against emancipation generally in the United States, as decided in *Mitchell* v. *Wells,* 37 Miss. R. Before the passage of this Act, it was against our law and policy to emancipate slaves here. It never was, and is not now, against our laws or policy to remove slaves from this State. Yet the Act of 1842 declared it unlawful to direct by will that slaves should be removed from this State *to be emancipated elsewhere.* It was not

the removal of the slaves against which the law was directed, but their emancipation; and it follows that, unless it declared our policy against emancipation elsewhere, it meant nothing.

It is the obvious policy of this State, as well as her interest, to perpetuate African slavery in the American Union. It is the basis of our social and political relations, and enters into the framework of our government. It is the bond which binds scarce less than half the States in a sisterhood more close and intimate than the compact of Union, for their mutual protection and preservation; and the remainder in a league of offensive war against the States which tolerate and sustain it. It is our policy—our interest—that not one State should emancipate its slaves, and that more slave States should be admitted into the Union. Could any man look with unconcern upon the emancipation of slaves in Missouri, or Virginia, or Maryland? And was it not felt as a calamity when "Kansas was dedicated to abolition?" Would this court hold valid a devise or bequest to the Massachusetts Emigrant Aid Society—a corporation organized to expel slavery from the Territories of the Union? And if not, will it sustain a bequest to a society which not only seeks to emancipate slaves in the Territories but in the States themselves—a society which, in the language of this court, is "at war with the institution of slavery"—"the avowed public enemy of our laws and policy in relation to slavery?" *Mitchell* v. *Wells,* supra.

We submit, then, that the bequest is void, even as a pecuniary one, for it certainly cannot be of the smallest interest to this State whether the forty or fifty slaves belonging to the testator should be emancipated, or whether they be sold into slavery, and their price vested in the emancipation of a like number of other slaves.

3. As to the estoppel set up in the answer against Mrs. Cowles. This, we presume, is supported upon the doctrine that Mrs. Cowles, having elected to take under the will, cannot take in opposition to it. But the doctrine does not apply in cases of this character. "In order to raise a question of election, there must be a personal competency on the part of the authors of the attempted disposition to make it, as the doctrine is founded

on intention, which presupposes competency." 1 Jarm. on Wills, 385.

The doctrine is founded in the idea of compensation to the legatee, who has been disappointed, not by law, but the act of the person against whom it is sought to be enforced. It is a doctrine invoked to effect the intention of the testator, always presupposing the intent to have been legal. Thus, under the old law, when personal was, and real estate was not, disposable by will of a person under age, the heir of the infant testator was allowed to take his real estate in opposition to the will, without relinquishing a legacy bequeathed to him by the same will. 1 Jarm. on Wills, 388. We presume this point will not be pressed or seriously relied on.

Having disposed of the claims of the Colonization Society, we come now to dispose of the pretensions of General Waul.

4. The next question is, the bequest of the slaves being void, do they go to Waul, or to the heir?

This is to be determined by the provisions of the Act of 1842, Hutch. Dig. p. 539, § 11. The latter clause of this section has already been decided by this court, in at least three cases, to apply as well to wills made after, as to wills made before, the passage of the Act. See *Read* v. *Manning,* 30 Miss. R. 308; *Lusk* v. *Lewis,* 32 Miss. R. 297; *Lusk* v. *Lewis,* 34 Miss. R. 401.

These are all solemn decisions of this court, made upon full argument, by able counsel, and we presume this question is not now open for debate or examination.

It has also been decided in all of these cases that the heir takes · in preference to the residuary legatee, and this would seem to settle the question at issue. But it will be now contended that this case is taken out of the foregoing decisions, by the declaration in the fourth clause of the codicil, " intending he shall take all my property, real and personal, that by invalid disposition or in any other manner shall come into the residuum of my estate." Independent of this statute, this declaration is but the legal effect and meaning of the residuary clause. The testator has but declared what the law itself would have declared was his meaning and intention. The main object in construing wills is to find out the intention of the testator, and when this is done, that inten-

tion, if legal, will be carried into effect by the court. The rule, then, that the residuary legatee should take invalid dispositions of personalty, is but the result of the meaning attached to the residuary clause of the will; that is, that it is the intention of the testator that the legatee should take in preference to the heir. This is proven not only from the general rules in relation to such matters mentioned above, but from the further fact that wherever it appears from the will affirmatively, that the heir shall take in preference to the residuary legatee, the heir will so take. From this, it would appear manifest that the declaration of intention made by the testator in favor of the residuary legatee is but the expression of what would have been implied without it, and hence, that it can have no effect to change the rule on that subject as settled by this court.

But this statute is not to be construed upon any idea of carrying out the intention of the testator; for it is based upon the solemn declaration of the legislative will that the intention of the testator is not to be carried out, but defeated.

The right to make a testamentary disposition of one's effects is not derived from natural but municipal law; and being so derived, to be effectual, it must be exercised in pursuance of that law. 2 Black. Com. p. 12. Hence that law declares who shall be capable of making a will, all others not thus included being debarred from the right; and it prescribes the forms and solemnities necessary to be observed to make a will valid. And when the general testamentary capacity exists, and the prescribed forms have been observed, it is still to be decided by reference to that law, whether a particular disposition of property made in the will is legal and valid or not. In some instances the testamentary power is restricted in respect to a particular kind or portion of property belonging to the testator, as the dower of the wife; in others the incapacity exists in reference to the devisee or legatee, as bequests to a slave, and a religious corporation, and a devise of realty to an alien. In other instances, the testamentary capacity is restricted in reference to the uses and purposes of the bequest or devise, as in the present case—a bequest of slaves for emancipation. These restrictions upon the general testamentary capacity are based on the ground that the intention of the testator

shall not be carried out—such intention being unlawful, or against the public interest or public policy. The sovereign power having the right to regulate absolutely the disposition of property within its limits, *inter vivos*, and by testament, has declared that the will of the testator shall *not* be the rule by which his property shall be disposed of after his death, but instead thereof, the legislative or sovereign will shall prevail. It follows, therefore, that no legitimate argument in favor of the disposition of the property over, after a bequest for emancipation, can be based upon an intent of the testator expressed or implied, in opposition to the plain provisions of the statute. It was as much within the legitimate powers of the Legislature to declare the person who was to take slaves, in case they were bequeathed to be emancipated, as it was to declare that the bequest of emancipation itself should be illegal and void. Our inquiry, then, is confined to an examination of the statute, with a view of ascertaining if any such declaration has been made, and if so, what it is. "In construing statutes, the main object in all cases is to ascertain the true meaning or intention of the law; and whenever that intention can be ascertained, courts are bound to give it effect." "And a primary rule of construction is, that the words are to be taken in their ordinary and familiar acceptation." *Green* v. *Weller*, 32 Miss. R.

A statute must be so constructed as to effectuate the policy intended to be established by the Legislature; and this must be done even if in opposition to its strict letter. *Ingraham* v. *Read*, 30 Miss. R. 343 ; *Read* v. *Manning*, 32 Id. 308.

But the literal construction must never be departed from, when it is consonant with the policy inaugurated by the law and to the general manifest intent of the Legislature prevailing throughout the whole Act. We may also look to the mischief under the old law, and the remedy devised, or the means designated to effectuate the new policy established.

Statutes are not self-executing. Means must be provided, if they do not already exist, for bringing them into action and enforcing their sanctions. This is true of every statute, but most particularly of statutes intended to inaugurate a great public

Garnett, Admr., et al., *v.* Cowles and Wife.

policy deemed essential by the Legislature for the welfare and happiness of society, and to guard a cherished institution threatened with destruction by secret doings in our midst, aided by aggressive incroachment abroad. It is therefore too plain to require discussion, that if in such a statute words be found which naturally indicate the means provided by the Legislature to enforce the law, and if the means so provided be appropriate for that purpose, then we must conclude that the Legislature intended by the use of these words what they so manifestly mean. And this is more particularly and clearly so, when there is no other appropriate means found for the enforcement of the sanctions of the law.

Let us test this statute by these rules.

1. The mischief of the old law was, that testators, under the influence of mistaken philanthropy or a morbid or fanatic sense of duty, bequeathed that their slaves should be removed from the State for emancipation, or, if thwarted in that purpose by the plain letter of the law, no longer feeling an interest in the institution of slavery, they would select persons to whom their illegal purposes were known, and to whose honor and conscience they would confide their plans in secret trust to execute their illegal purposes. Such testators were rarely *inops concilii*, but were well instructed in the necessary machinery to execute their purposes. This was felt and acknowledged to be an evil, which called for legislative interposition.

2. The remedy provided was the declaration that all such bequests should be void, and the inauguration of a new policy against emancipation generally in the United States, or at all events against emancipation by will.

3. The judicial history of the English people had shown how unavailing were mere statutory provisions intended to thwart cherished wishes of testators with reference to property over which they had testamentary power, and to what shifts they would resort, what devices invent, to carry out an object prohibited by law, but to accomplish which they were impelled by a sense of religious duty, and how often the end so much desired was attained in spite of the statutes of mortmain and religious uses; and hence it was proper to provide, as the Legislature did

provide, the means to render effectual the remedy indicated. The means were, the selection of a person whose interest would impel him to an enforcement of the statute, and the denial of a right to make a will in reference to slaves, whenever it could be shown that the testator had provided for their emancipation.

It is easy to show that the Legislature not only intended to deprive the owner of slaves of the power by last will and testament to emancipate them, but also to provide, in *all cases,* what direction the property should take when an attempt had been made to dispose of it in violation of the Act.   The remedy was, to deprive the owner of the means to evade the statute by destroying his testamentary capacity in respect to the property so attempted to be bequeathed for illegal purposes.  If the intention of the Legislature had been simply to declare bequests for emancipation void or unlawful, as was done in the first clause of the 11th section, the slaves would have gone under the rules of law to the residuary legatee, if there had been one; if not, to the heir; and this we are bound to presume was known to the Legislature.   Then unless the Legislature had intended to make provision for its ultimate destination, the *remainder of the* statute was useless and idle.   The language used in this Act makes the construction contended for clearly necessary.   It is, *"that the* SAME *shall descend to, and be distributed amongst, the heirs at law* of the testator, or be otherwise disposed of according to law, *in the same manner as if such testator had died intestate."*  It is peculiarly significant and too clear for construction.   If all had been omitted after the words, " heirs at laws," the property would have gone to the heir, to the exclusion of the widow.  If the statute had provided farther, and ended with the next clause, "or be otherwise disposed of according to law," then the property would have gone to the residuary or alternative legatee, if there had been one ; otherwise, to the heir.   But when it is further declared that the disposition according to law shall be " in the same manner as if such testator had died intestate," another destination is given to the property different from what it would have been under any of the readings above suggested.  Here the intestacy of the testator is declared with reference to the slaves, and their final destination fixed upon that basis.   Statutes must be so construed that

every word, if possible, shall have effect; none are to be regarded or treated as nugatory or surplusage, if a reasonable construction can be otherwise arrived it. We are not to suppose that the Legislature did not understand the meaning of the words used, or that, like a dull speaker, they repeated the same idea with a slight change in phraseology. If they intended that, after an attempted emancipation, the slaves should go to the heir or a legatee, as the testator might direct, the last clause was not only useless and nugatory, but was clearly inappropriate to convey the idea, since it means directly the·reverse.

We might rest on this argument, and say the law is so written; but we will go farther. We will prove that the last clause, taken in its plain meaning, as we have shown it, was appropriate, if not absolutely essential, to effectuate the policy of the Legislature. As before remarked, statutes are not self-executing. They can only be enforced through human instrumentality. Here a great public policy is declared—a great public mischief reprobated. The violator of the law cannot be punished: he is dead, and not subject to indictment. The only means left was to provide for a forfeiture of the property to the public, or the designation of some person to whom it should be given. The first was inappropriate, because the law of escheat is never enforced, and besides, the family of the testator, by natural right, is entitled to the property. The Legislature, then, must either designate the person to take, or give this power to the testator. To have intrusted the testator with the appointment of the person who should defeat and thwart his wishes would, in effect, have been to authorize the culprit to select his own judge, jury, and prosecuting officer. Whom would he select? Would he select one who agreed with him as to the policy and humanity of emancipation, or one who thought that, deceived by a false philanthropy, and lured by a mistaken sense of religious duty, the testator had injured his country and conferred no boon on his slaves? Would he select a needy adventurer, whose daily bread was bought by his daily toil, and whose necessities would compel him to enforce his alternative right to the slaves; or one surrounded with wealth and the enjoyments which wealth purchases—surfeited, if not contented? Would he select one

who would prefer the calls of public duty to the claims of private friendship, or one "who, after accepting the executorship of his will, would faithfully desire to carry out its provisions" for emancipation, and for fifteen years would refuse to assert his rights, or enforce the law, and at last only step in to avert the blow about to be stricken by the heir? The answer to these questions is plain and easy. However faithful or faithless the selected legatee might. be to the wishes of the testator after his death, it is certain that the testator would select one whom *he* thought would be faithful. These views are so' obvious that they could not escape the legislative mind. And hence it was clearly proper that the Legislature should destroy the testamentary capacity of a person hostile to the institutions and policy of the country, to the extent there was an intent to effect an illegal purpose, and thus select its own agent to enforce its own policy. The Legislature has done so, and it has done wisely.

·All history has shown—at least all judicial history has shown—that the heir is jealous of his rights; that he regards himself as entitled by natural right to succeed to the property of his ancestor, and believes all other dispositions made by will to be an incroachment upon his legitimate inheritance. Hence he is ever ready to assert, with unrelenting rigor, any provision of law which defeats a legacy, and sends the property in its natural channel.

A legatee, a stranger to the testator, with no claims on his bounty, and with no need of his bounty, and selected as we have shown he would be with reference to his pliability to the testator's wishes, would consider himself bound in honor, if not forced by very shame, not to take a bequest for his own use, in opposition to the declared wishes of the testator. He would, therefore, remove the slaves for emancipation. The heir, regarding himself as robbed, would enforce his legal right to the last cent.

5. But the proof shows that the bequest to Waul was in secret trust for emancipation. Waul denies this agreement in his answer; but he admits that he knew of the existence of the letter to Finley, and that, as executor, he faithfully desired to

carry out the testator's wishes, "so far as they came in conflict with no law" or policy of the State. He also admits that he knew that the testator was exceedingly anxious to emancipate and colonize his slaves through the agency of the trustees of the American Colonization Society, "and that the reason the testator made him residuary legatee was, because he feared some obstacle might be placed in the way by petitioner, or some other of his kindred pecuniarily interested." Here, then, is a distinct and positive admission of knowledge, on the part of Waul, of the testator's illegal purpose, and, what is equally important, an admission that it was a part of the scheme that he was appointed legatee under the apprehension that the next of kin would interfere. The confession of his willingness to carry out the wishes of the testator, and his acquiescence therein, for fifteen years, is absolute; for the qualification put in, "so far as they are not opposed to law," &c., is meaningless, for he was bound to know that the wish and purpose to emancipate was illegal.

Again, the force of his answer is destroyed by the false suggestion that the object of the testator, in making the bequest to him, was "a secondary object—to place said slaves with one whom he believed would make for them a just and humane master." This is a purpose falsely attributed by Waul to the testator, for it is shown by the will that the testator had a nephew, (S. H. Cowles,) to whom he was attached, and in whose humanity he had the utmost confidence, for he expresses the wish that he, instead of Waul, should have the management of the slaves. This suggestion, then, is shown to be false—*falsus in uno, falsus in omnibus.* The letter to Finley fully discloses the object of the testator in making Waul residuary legatee. After informing Finley of the contents of his will, and of his desire that the trustees should purchase the slaves for the Colonization Society, he proceeds: "You can get a copy of the will and learn the condition of the estate, and in *connection with the other trustees and the executor* do what seems best." Here is a clear expression of the important fact, that the executor would co-operate with the trustees in carrying out this scheme to evade the statute, and Waul acquiesces in it for fifteen years, and acts in accord-

ance with the suggestion.    He endeavors "faithfully to carry out the testator's wishes."

But if the testator intended, as a secondary object, that his slaves should remain in servitude, why select Waul?    They are strangers in blood; it is not shown that the executor felt under any obligations to provide for him.    And indeed he fails to do o, except as a secondary object; and this, according to Waul, was not for his benefit, but the benefit of his slaves.    Why disinherit his kindred for a stranger, when he had shown that he had a near kinsman to whom he was attached, and whom he believed would be a humane master?    But Waul himself furnishes the evidence to overturn his answer, and establish the trust.    He has a sale in little more than a year after testator's death; he is informed that some person had charged that he intended to keep to the slaves, and defeat the bequest for emancipation; he denounces the statement as false, and the author as a scoundrel and a liar.    Why this excitement, why this denial, unless he had been under some obligation not to thwart the testator's cherished wishes to co-operate in emancipating the slaves? This makes him a party to the illegal enterprise, and, having embarked in that bottom, he must go down with it.

HARRIS, J., delivered the opinion of the court:

Appellees filed their petition in the Court of Probates for Yalobusha county, praying for distribution of the estate of Samuel Hurd, deceased, to the said Polly Cowles, as his heir at law.

The petition does not appear in the record.    But, from the answers of the American Colonization Society, of H. T. Garnett, admr. *de bonis non* on the estate of said Hurd, and of T. N. Waul, claiming to be residuary legatee, as well as from the arguments and admissions of counsel, it is to be inferred that the petitioner bases her claim, as heir at law, upon the assumed invalidity of the will of Samuel Hurd, deceased, a copy of which appears in the record before us.

It seems to be charged in the petition, and admitted by all the answers, that it was the object of the said Hurd, originally, and especially by the twelfth clause of his will, to emancipate his

slaves; but all parties deny any *agreement, secret or otherwise, or any participation* with said Hurd as to such illegal purpose.

The answer of the Colonization Society denies that they had any knowledge of said testator's purpose, or will, until after his death; or that, since his death, they have in any manner assented to the provisions of said will. They allege that they are a corporation, duly authorized to sue and be sued, and capable, in law, of taking and holding property and money, by gift, bequest, devise, or otherwise, within the limits of Mississippi. They claim that they may lawfully insist on the sale of the negroes of said estate, for their benefit, under the twelfth section of said will, and that they have a right to renounce the illegal trust, or bequest, and to take the pecuniary legacy bequeathed to them, absolutely discharged from such illegal trust or conditions.

The answer of Waul admits the statements of the petition in relation to the execution of the will, and its purpose, through the agency of the Colonization Society and the trustees named in said will, to emancipate testator's slaves. Admits the writing of the letter, mentioned in petition, as evidence of testator's intent thus to emancipate his slaves; that it was written by Hurd about the time of the original draft of his will by himself; that the same was published in the *Liberia Advocate*, as charged in the petition. Admits the making the codicil to said will, as stated in the petition, by which respondent, Waul, was made residuary legatee; and recites the fourth clause of said codicil. But, denies, most positively, that there ever was any secret agreement, or understanding, between the said Hurd and the said Waul, that in case the said twelfth clause of said original will should be declared void, that he, as residuary legatee, would, nevertheless, emancipate said slaves; denies any knowledge of, or participation in, any trust, secret or otherwise, or that any such trust, or purpose, was intended, by said fourth clause of said codicil, different from what is expressed on its face.

Believes that said Hurd's primary object, in his original will, was to emancipate his slaves through the aid of Gray, Means, and Finley, (the trustees named in said will,) and the American Colonization Society; but fearing that he might fail in accomplishing this purpose, as a secondary or alternative object, and

in order to secure to his slaves a just and humane master, he executed said codicil, making said Waul his residuary legatee; and claims said property mentioned in said will, under and by virtue of said codicil, as now rightfully belonging to him; makes his answer a cross-bill, tenders an indemnifying bond, and prays that the property may be distributed to him.

It will thus be seen that there are three parties presenting themselves in court to claim this estate:

1st. The American Colonization Society claims, under the twelfth clause of the will, the sale of the negroes, &c., and to have the proceeds, as a pecuniary legacy, discharged of the illegal trusts, conditions and purposes of the will; *which are admitted by them* to have been desired, and intended to be accomplished, by this clause.

2d. The residuary legatee, Waul, who denies the illegal *purpose or intent* of the testator, or of himself, in relation to the bequest contained in the codicil, and insists that this bequest was intended to convey the slaves to him in servitude, and to secure to them a just and humane master, in the event that his main purpose, expressed in the original will, should prove void or ineffectual to accomplish their freedom and removal to Liberia.

And, lastly, the heir at law, Polly Cowles, who insists, first, that both the original will and the codicil are infected with the same illegal attempt and intent or purpose of emancipation; and, second, that if this be not so, then the *whole will is declared void* by the true reading of the Act of 1842, forbidding the emancipation of slaves by will, and directing that "the same shall descend to and be distributed amongst the heirs at law of the testator, or be otherwise disposed of, according to law, in the same manner as if such testator had died intestate."

This last claim is dependent upon the invalidity of the two first. We will therefore settle the rights of Mrs. Cowles, in deciding whether either Waul or the Colonization Society have any rights here.

And, first, of the claim of the American Colonization Society. It will be observed that this claim is urged upon the ground, 1st. That the *testamentary purpose* disclosed upon the *face of the*

*will* may be fully effected without emancipating the slaves or violating the law.

2d. That the record affords no evidence which, taken by itself, or in connection with the will and the circumstances surrounding the testator at the time, can establish such unlawful purpose.

3d. That the statute cannot be applied to a will which discloses no illegal purpose *on its face,* and which, if carried into effect, according to *its terms,* would not be illegal; no matter what may have been the *purpose* of the testator.

4th. That the *belief, desire,* or *hope* of emancipation, although *constituting* the *motive or purpose of the bequest,* so long as the legatee is left free to obey his own will instead of that of the testator, will not bring the will within the operation of the statute.

5th. That unless emancipation is to take effect by force of the terms of the will, the *unexpressed intent or purpose* of emancipation with which it was made, though existing in the mind, will not, under the statute, affect the validity of the will.

6th. That no *trust* is created by this will, either taken by itself or in connection with facts in proof.

To all this one answer is obvious and conclusive. The Act of 1842, sec. 11, Hutch. Code, p. 539, declares that "hereafter it shall not be lawful for any person, by last will or testament, to *make any* devise or bequest of any slave or slaves, *for the purpose* of emancipation," &c.

*The statute* declares that the *"purpose of emancipation" "shall not be lawful,"* and it is not for courts, however averse to the punishment of intention alone, to say, that the Legislature may not visit with the penalty of invalidity any contract or other instrument tainted with a fraudulent or criminal intent, though pure and unspotted on its face.

Such statutes have been enforced, and such *unlawful intent* has been visited upon deeds, perfectly fair on their face, made to secure honest debts to innocent and even confidential creditors wholly ignorant of *fraudulent intent,* both in Great Britain and in the several States of this Union, too long to be questioned at this day either as to their policy or validity.

That this will was made "*for the purpose of emancipation*," we are satisfied *from the face of the will itself;* and, reasoning from human conduct and feelings to human motives, we think the *purpose* could scarcely be made more manifest by the plain declaration of intent contained in the other evidence, to be found in this record. We shall not stop to discuss this view of the case, as we are relieved from such necessity by the luminous and overwhelming analysis of the will, on this point, contained in the able brief of counsel for defendant in error.

We hold it clear, therefore, that under the Act of 1842 this will, so far as it attempts to constitute the American Colonization Society a legatee, is void. See *Lusk* v. *Lewis*, 32 Miss. R. 297; *Lewis, admr.*, v. *Lusk*, 35 Miss. R. 401.

We are next to consider this will in reference to the claim set up by the appellant, Waul, as residuary legatee.

It is insisted by counsel for defendant in error that this bequest is void, under the Act of 1842. Hutch. Dig. p. 539, sec. 11. The section reads as follows:

"Hereafter it shall not be lawful for any person, by last will or testament, to make any devise or bequest of any slave or slaves for the purpose of emancipation, or to direct that any slave or slaves shall be removed from this State for the purpose of emancipation elsewhere; and in all cases of wills heretofore made and admitted to probate within this State, whereby any slave or slaves have been directed to be removed from this State, for the purpose of emancipation elsewhere, or whereby any slave or slaves have been devised or bequeathed in secret trust for such purpose, unless such slaves shall be removed from this State within one year after the passage of this Act, it shall not be lawful for the executor or executors of such last will or testament, or the person or persons having possession of such slave or slaves under the provisions of such will, so to remove such slave or slaves; but the same shall descend to and be distributed amongst the heirs at law in the same manner as if such testator had died intestate," &c.

We recognize the rule established in *Reid* v. *Manning*, 30 Miss. R. 308, *Lusk* v. *Lewis*, 32 Miss. R. 297, and *Lewis, admr.*, v. *Lusk*, 35 Miss. R. 401, that the latter clause of this section

applies as well to wills made after as to wills made before
the passage of the Act. But counsel are mistaken when
they suppose that, in these cases, or in either of them, it has
been held "that the *heir* takes in preference to the *residuary
legatee.*"

That question did not arise in either of these cases; there was
no *general residuary legatee* in either of them; and, as applicable
to the facts before the court in those cases, there is not a word
which may .not properly stand. Each decision, upon well-
settled principles, is considered as applicable alone to the facts
then before the court. See *Pass* v. *McRea*, 36 Miss. R. 148.

Indeed, the case of *Lewis, admr.*, v. *Lusk*, 35 Miss. R. 401, is
an authority *directly against* the position assumed by counsel,
("that the whole will is void, and the property must descend to
the heir at law, notwithstanding there may be provisions in the
will perfectly legal.") For in this case, notwithstanding the will
was declared void both as to the slaves and to the pecuniary
bequest dependent upon this invalid disposition, yet the Board
of Education and the Board of Missions of the Presbyterian
Church, as *residuary legatees* of the entire estate not disposed of,
except the slaves which were not to be sold, were declared entitled
to hold the same; and it is here said, in reference to the state of
facts then before the court, and also as to the construction of
the Act of 1842, that "the rule is incontrovertible, that the
*residuary legatee* takes whatever by lapse, invalid disposition, or
other casualty, falls into the *residuum;*" and the court say ex-
pressly that the slaves would also have taken the same course,
but that they were reserved from sale, and could not therefore
take the course directed by the residuary clause, which had
relation alone to the proceeds of the sale it directed to be made.

It is insisted, however, that the Act of 1842 is not to be con-
strued in reference to the intention of the testator, but that it is
the object of the statute to defeat that intention, and to destroy
the right of testamentary disposition, wherever an attempt is
made to violate the provisions of this Act; that in this respect
it is penal, and it is the policy of the statute to make the heir a
common informer by allowing him the benefit of his vigilance

in exposing and bringing before the courts such illegal bequests.

The design of the Act, both from its language and the subject-matter, was not to interfere, unnecessarily, with the great and sacred right of testamentary disposition. Its subject-matter is to make unlawful the emancipation of slaves by will ; its language is clear, apt, and appropriate, to effect this object, and must be construed to be co-extensive with this design—not to exceed it, and thereby limit the right of testamentary disposition and destroy the rights and interests of the innocent beneficiary of the testator's bounty, where his will violates no rule of law, nor, on the other hand, to encourage the spirit of evasion and artifice which a wicked fanaticism may employ to defeat the salutary operation of a wholesome law.

As suggested in the opinion of the court in *Calvin Chiairs et al.* v. *Smith et al.*, 36 Miss. R. 646, it could scarcely be regarded as consistent with the object of the statute, or with any rule of just or nice policy, to hold that, because a testator, from mistaken views of humanity, should see fit in his will to direct the liberation of a favorite old servant of but little value, that the necessary dispositions of his will, in order to distribute justly a large estate among infant and adult children, and to provide for the maintenance and education of some or the misfortunes of others, should all be declared void, and the just and equal distribution of his whole estate thereby wholly defeated. It is enough to destroy the illegal disposition, and to give effect only to that which is legal.

It is, lastly, insisted, that even if the will is not rendered wholly inoperative, by the illegal attempt at emancipation evinced by the twelfth clause, that the codicil itself was executed with the same illegal purpose, and in the hope and expectation that Waul would emancipate the slaves bequeathed to him by the residuary claim, and send them to Liberia.

It is true, that if it was the purpose of the testator, in his codicil, to emancipate his slaves, and to use his residuary legatee as an instrument for that purpose, it would be plainly within the prohibition of the Act, and equally invalid as the original will.

But we are wholly unable to discover either in the will or the circumstances in proof any such illegal purpose. On the contrary, the answer positively denies every allegation of any agreement, understanding, or purpose, of this kind; and the circumstances tend to support this denial.

In the first place, the testator originally drew his own will in the last week of April, 1846, and certainly did not then contemplate any thing but the agency then specified for the emancipation of his slaves.

There is no proof that he then relied on Waul, as his confidential friend in the business of emancipation, but he selected other and safer agents, whose residence and associations gave better promise that they would liberate his slaves. At the same time, or in the same week, in which he drew his original will, he wrote his letter to the *Liberia Advocate,* developing his plan of emancipation. There is no evidence that Waul either knew of the existence of the will, or the letter, until after the death of testator.

In that letter the testator expresses his difficulties arising out of the laws of Mississippi forbidding emancipation, and seemed to regard it as doubtful whether this cherished scheme could ever be carried into effect. It was altogether natural, therefore, that he should make an alternative disposition, so that in the event his scheme of emancipation should fail, he might still select a "just and humane master" for his slaves, who should retain them in servitude.

His scheme for evasion and avoidance of the laws of Mississippi was as perfect as it could have been made, without changing the agent. If the Colonization Society and the three trustees, Gray, Means, and Finley, could not do it, why expect that Waul could do it any better than they? If the law would arrest them, in the execution of his illegal purpose, why should he suppose that a gift to Waul, with the same intent, would prove any more effectual? He did not intend to die intestate, but, in the event that his emancipation scheme should be declared invalid, he intended to leave a valid will, selecting a master for his slaves. And hence, on the 6th June, long after his original

will was drawn, this codicil was executed, making Waul his residuary legatee.

It is said that Waul admits that he knew that the testator was anxious to free his slaves through the agency of the trustees, &c., "and that the reason the testator made him residuary legatee was, because he feared some obstacle might be placed in the way by petitioner or some other of his kindred pecuniarily interested." To do justice to his meaning, the balance of the sentence should be added: "he resolved as a secondary object to place said slaves with one whom he believed would make for them a just and humane master."

The latter member of the sentence affords a full answer to the argument, based upon the half quoted.

It is again said that the suggestion in the answer of Waul above quoted is shown to be false. Instead of trusting his negroes to Waul's humanity, he selected his nephew to have the management of the slaves. But the evidence does not sustain this argument, for the very clause of the will from which this idea is deduced makes the nephew only an assistant of Waul "in the little details of business, for which he may receive not more than $300, and board for himself and horse *so long as my executors may think it necessary.*"

It is again said that the letter to Finley discloses the object of the testator in making Waul residuary legatee. That letter was written the 28th April, 1846, and Waul was not made residuary legatee until the 7th June afterwards.

The last evidence relied on to prove Waul's connection with the illegal intent or purpose of the testator is a declaration made by Waul, more than a year after testator's death, in a speech at a sale of the estate, "that any person who charged that he (Waul) had claimed or ever would claim any interest in the property of the testator, in opposition to the American Colonization Society or its trustees, named in the will, was a scoundrel and a liar."

We think there is nothing in this declaration tending to show the purpose of Hurd or the purpose of Waul, before Hurd's death, (more than twelve months then past,) to violate or evade the Act of 1842, prohibiting the emancipation of slaves by will.

There is not a particle of evidence showing that Waul ever knew of the existence of such a will, or of the testator's design to make him executor or residuary legatee, until after the testator's death, nor is this declaration necessarily inconsistent even with his present position.

It follows from these views that, as residuary legatee, he is entitled to the property in dispute under the residuary clause in the codicil to said will, and that the heir at law can take nothing by his petition. Let this judgment be reversed and cause remanded for further proceedings, in accordance with this opinion.

A petition for a reargument was filed by the counsel of Mrs. Cowles, but it was overruled.